# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs August 19, 2014

## STATE OF TENNESSEE v. RUSSELL BROWN

**Appeal from the Criminal Court for Bradley County**
**No. 12-CR-059     Honorable Carroll L. Ross, Judge**

---

**No. E2013-02663-CCA-R3-CD - Filed November 20, 2014**

---

The Defendant, Russell Brown, was convicted by a Bradley County jury of first degree premeditated murder and aggravated arson for which he received concurrent sentences of life with the possibility of parole and 20 years, respectively.  On appeal, the Defendant argues that the evidence is insufficient to sustain his convictions and that the trial court erred in refusing to give a self-defense jury instruction.  Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., and DAVID A. PATTERSON, SP. J., joined.

Richard Hughes, Cleveland, Tennessee, for the Defendant-Appellant, Russell Brown.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Steven Bebb, District Attorney General; and Stephen Hatchett, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This appeal stems from the stabbing death of the victim, Harold Montgomery, in the early morning hours of January 1, 2012.  The Defendant was subsequently indicted on charges of aggravated arson and first degree premeditated murder.  The following proof was adduced at trial.

**State's Proof.**  On January 1, 2012, the Defendant turned himself into the Cleveland Police Department for the murder of the victim.  The Defendant consented to a buccal swab, which was administered by Lieutenant Brian Pritchard of the Cleveland Police Department.

Lieutenant Pritchard did not observe any signs of intoxication by the Defendant, such as slurred speech or an odor of alcohol. He also did not observe any injuries to the Defendant. Lieutenant Pritchard did not perform a blood test or rape kit on the Defendant.

Detective Andy Wattenbarger of the Cleveland Police Department gathered evidence and took photographs at the crime scene, a motel room at the Days Inn motel in Cleveland, Tennessee. A number of photographs depicting the motel room where the murder occurred were shown to the jury. Detective Wattenbarger confirmed that a fire had occurred inside of the motel room, but there was no evidence of an electrical fire as the cause. When he arrived on the scene, the victim had been removed from inside of the motel room and was lying on the sidewalk covered by a sheet. Inside of the room, Detective Wattenbarger found cocaine, drug paraphernalia, and alcohol. Detective Wattenbarger also found a glass pipe used to smoke crack cocaine in the victim's car, which was discovered by police in another location. On cross-examination, Detective Wattenbarger agreed that the victim was "soaked with water" as a result of first responders extinguishing the fire inside the motel room. He also agreed that evidence could have been washed away by the water and destroyed by the fire.

Detective Shane Clark, a crime scene technician with the Cleveland Police Department, collected anal and penile swabs taken by the medical examiner at the autopsy of the victim. These samples were submitted to the Tennessee Bureau of Investigations ("TBI") for analysis and were admitted into evidence.

Ben Atchley, the Fire Marshall for the Cleveland Fire Department, conducted an arson investigation at the Days Inn motel. Mr. Atchley testified that the fire in this case started at the foot of the bed in the victim's motel room and resulted in a "pretty significant fire." He believed that had the fire department not been called in time to extinguish the fire, the fire had the potential to spread from that single room to the entire motel. In the course of his investigation, Mr. Atchley found nothing to indicate that this fire was not intentionally set. On cross-examination, Mr. Atchley agreed that the victim was not on the bed when the fire was set.

Detective Matt Jenkins of the Cleveland Police Department recovered the victim's car in Niota, Tennessee on the property of Raymond McDermott, the Defendant's uncle. The car was parked in a wooded area about 150 to 200 yards off Mr. McDermott's driveway. Detective Jenkins stated that based on his experience with stolen vehicles, the victim's car was "without a doubt" parked in that area in an attempt to hide it.

Bill Patel, the owner of the Days Inn motel in Cleveland, Tennessee, testified that he did not give the Defendant permission to set a fire in the motel room and confirmed that there

were other guests staying at the motel on January 1, 2012. He estimated that the damages to the Days Inn motel caused by the fire totaled approximately eight or nine thousand dollars.

Dr. Christopher Lochmuller, a forensic pathologist and Chief Deputy Medical Examiner at the Regional Forensic Center, performed the autopsy on the victim and was tendered as an expert in forensic pathology. Dr. Lochmuller opined that the victim's cause of death was multiple stab wounds and the manner of death was homicide. According to Dr. Lochmuller, the victim suffered 19 total stab wounds. Two wounds, a stab wound to the neck that struck the victim's carotid artery and a stab wound to the chest that punctured his lung, were fatal and would have resulted in the victim's death within "minutes" if left untreated. However, with medical attention, the victim likely would have survived all of his wounds. Dr. Lochmuller testified that as a result of the wounds to his neck and chest, the victim's lungs filled with blood and likely would have caused him to make "gurgling" noises. He noted that the victim did not have any burn injuries and confirmed that the victim died from his stab wounds and not from smoke inhalation. Dr. Lochmuller collected anal, penile, and oral swabs from the victim, which he gave to Detective Shane Clark to submit for analysis. On cross-examination, Dr. Lochmuller testified that the victim's blood test revealed that cocaine and painkillers had been recently ingested by the victim prior to his death. The effects of such drugs include euphoria, excitement, restlessness, risk taking, sleep disturbance, and aggression. Dr. Lochmuller noted that the drugs were not at toxic levels, and the victim would have maintained the ability to function.

Special Agent Jennifer Millsaps of the TBI was tendered as an expert in the field of serology and DNA analysis. She conducted the DNA analysis of the items submitted by the Cleveland Police Department, which included an anal and penile swab from the victim. The anal swab from the victim revealed the presence of spermatozoa, with the predominate DNA profile belonging to the Defendant and the minor DNA profile belonging to the victim. The penile swab from the victim revealed no DNA profile other than the victim.

**Defense's Proof.** The Defendant, 36 years old at the time of trial, testified that he and the victim had been friends since childhood. The Defendant began using drugs at the age of 16, and his friendship with the victim eventually evolved into "a sexual relationship, based on drugs." The Defendant testified that he does not consider himself a homosexual man but that his sexual relationship with the victim was fueled by his addiction to cocaine. The victim provided cocaine to the Defendant, and the two used cocaine "[e]very single time" they were together.

On December 31, 2011, the Defendant and the victim decided to spend the night together at the Days Inn motel to celebrate the Defendant's birthday and New Year's Eve. Earlier that day, the two men purchased cocaine, alcohol, and prescription pills and socialized

with the victim's roommates at his apartment. Around 11:00 p.m., the men went to the Days Inn motel where they continued to use drugs and drink alcohol. After smoking crack cocaine, the Defendant penetrated the victim anally, and the victim performed fellatio on the Defendant. The Defendant maintained that the victim never penetrated him anally because he does not "consider [himself] to be a homosexual male." He testified that the victim was aware that the Defendant was "opposed" to that "type of relationship[.]"

The Defendant claimed that after their sexual encounter, he went to sleep and awoke to find the victim penetrating him anally. The Defendant testified that he "got [the victim] off of [him]" and a physical altercation ensued between the men. The Defendant then realized that the pocket knife that he and the victim had used to cut the crack cocaine earlier in the evening was "still open" on the night stand so he picked it up and began stabbing the victim. He continued to stab the victim 19 times. The Defendant stated, "I was really mad that he would violate me like that. I was completely irate. That's, that's not part of our relationship." The Defendant then set the bed on fire with a lighter, took the victim's car, and fled the scene.

The Defendant threw the pocket knife into the Hiwassee River while driving over a bridge and drove to the home of his uncle, Paul Brown. He called his mother and told her what happened, and she and Mr. Brown encouraged the Defendant to turn himself in to the police. He refused and instead drove to the home of another uncle, Raymond McDermott. The Defendant hid the victim's car in a wooded area near Mr. McDermott's home. Mr. McDermott drove the Defendant around for "several hours" and tried to calm him down. Mr. McDermott then took the Defendant to the home of Robert Johnson, another family member, who convinced the Defendant to turn himself in to the police.

On cross-examination, the Defendant acknowledged that he was bigger than the victim and that the victim was not armed when he and the Defendant began fighting. He agreed that the fight was over when he picked up the knife and that he picked up the knife with the intent to hurt the victim. He also agreed that he intentionally set the bed on fire before leaving the motel room. He added that he had not seen any other guests at the motel that night and did not know whether any one else was at the motel when he set the fire. According to the Defendant, the victim told the Defendant that he suffered from Acquired Immune Deficiency Syndrome (AIDS) "after knowingly, willingly . . . letting [the Defendant] perform on him, and attempting to have anal intercourse with [the Defendant]."

Alma Brown, the Defendant's mother, testified that she had known the victim for 20 to 25 years and that he had been good friends with the Defendant "since they were kids." The Defendant and the victim spent a lot of time together, but Ms. Brown had never seen the two men argue or fight. On January 1, 2012, the Defendant called Ms. Brown and said,

"Mama, I'm sorry. I didn't mean to do it." She did not know what the Defendant was talking about and told him she had to get ready for work. The Defendant hung up the phone and her brother-in-law, Paul Brown, immediately called her back. After talking with Mr. Brown, Ms. Brown drove to Mr. Brown's home to see the Defendant. When she arrived, the Defendant was crying and told her that the victim was dead. They both cried, and Ms. Brown told the Defendant that he should turn himself in to the police. The Defendant did not turn himself at that time, and Ms. Brown went to work. After work, she went to her the home of her uncle, Robert Johnson, to see the Defendant. Once Ms. Brown arrived, Mr. Johnson convinced the Defendant to turn himself in to the police.

Dr. Louise Ledbetter, a board-certified neurologist, was tendered as an expert in the field of neurology. She testified that she had 20 years of experience in treating patients with drug and alcohol addictions and had studied how the brain and body respond to these substances. She interviewed the Defendant on two different occasions and reviewed the evidence in this case. She noted that based on the victim's blood results, he had high levels of cocaine and two types of opiates, hydrocodone and oxycodone, in his system at the time of his death. She testified that these drugs are powerful, psychoactive substances that affect an individual's perception, ability to process information, emotional reactions, and overall behavior. She explained that it lowers one's inhibitions, "like the filter is gone." The Defendant told Dr. Ledbetter that he was under the influence of alcohol, Xanax, marijuana, hydrocodone, and crack cocaine on the night of the murder. Based on the information she gathered, she opined that the Defendant was intoxicated at the time of the murder and unable to make good decisions. She further opined that the Defendant lacked the ability to premeditate. She acknowledged that she was not provided a blood test for the Defendant to confirm his drug or alcohol levels and that she based her opinion on the Defendant's statements about his drug use that night.

**State's Rebuttal Proof.** In rebuttal, the State called Dr. Jerry Glynn Newman, Jr., a board-certified forensic psychiatrist, and he was tendered to testify as an expert in the field of forensic psychiatry. He interviewed the Defendant and reviewed the evidence in this case. The Defendant told Dr. Newman his version of the events and why he killed the victim. The Defendant told Dr. Newman that he had been sexually molested as a child and that when he awoke to find the victim anally penetrating him, "it upset [the Defendant] a great deal." The Defendant told Dr. Newman, "I wanted to hurt [the victim] because he hurt me . . . . I truly wanted to him to hurt." Dr. Newman opined that the Defendant had the capacity to premeditate at the time of the murder. He noted that the Defendant admitted that he wanted to hurt the victim, and stated, "[I]f he had that capacity, I think its not a giant leap to say he had the capacity to form the intent to kill as well."

The State also called Lieutenant Mark Gibson of the Cleveland Police Department, who interviewed the Defendant shortly after the Defendant turned himself in to police. Lieutenant Gibson specifically asked the Defendant if he had any injuries, and the only injury reported or observed was a small abrasion to one of the Defendant's hands. He did not report any other injuries to his face or rectum. He also did not show any signs of intoxication.

Following the proof, defense counsel requested a jury instruction on self-defense. After a discussion among the prosecutor, defense counsel, and the trial court, the trial court concluded that the facts did not warrant a self-defense instruction. Following deliberations, the jury convicted the Defendant as charged in the indictment of aggravated arson and first degree premeditated murder. The trial court imposed concurrent sentences of 20 years and life with the possibility of parole, respectively.

On September 11, 2013, the Defendant filed a timely motion for new trial, which was denied by the trial court after a hearing on October 28, 2013. The Defendant filed a timely notice of appeal to this court on November 25, 2013.

## ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to sustain his convictions for first degree premeditated murder and aggravated arson and that the trial court erred in declining to give a self-defense jury instruction. The State responds that the evidence is sufficient to support both convictions and that the trial court properly denied the Defendant's request for a self-defense jury instruction. Upon review, we agree with the State.

**I. Sufficiency of the Evidence.** The Defendant first challenges the sufficiency of the evidence supporting his convictions for first degree premeditated murder and aggravated arson. When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."). The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). Further, the standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v.

Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. Id.

**A. First Degree Premeditated Murder.** In challenging his conviction for first degree premeditated murder, the Defendant argues that the State failed to establish the element of premeditation. He avers that the evidence established that he acted in a moment of excitement and passion and that he lacked the ability to premeditate due to his level of intoxication.

First degree murder is the premeditated and intentional killing of another person. T.C.A. § 39-13-202(a)(1) (2007). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. "'Premeditation' is the process of thinking about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992) (quoting C. Torcia, Wharton's Criminal Law § 140 (14th ed. 1979)).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the

killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997) (citing Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992)). Additionally, the infliction of multiple wounds, the destruction or secretion of evidence of the murder, and the defendant's failure to render aid to a victim tend to support a finding of premeditation. State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000) (citing State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). Of course, "[a] jury is not limited any specific evidence when determining whether a defendant intentionally killed the victim after the exercise of reflection and judgement." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003) (internal quotation marks and citations omitted). "The facts listed in Bland and other cases simply serve to demonstrate that premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done after the exercise of reflection and judgement[.]" Id. (internal quotation marks and citations omitted).

Viewed in the light most favorable to the State, the evidence in the present case established that the victim died as a result of multiple stab wounds inflicted by the Defendant on January 1, 2012. The Defendant testified that he and the victim were entangled in a physical fight immediately before the killing; however, he admitted that the fight had subsided by the time he picked up the pocket knife and that he picked up the knife with the intent to harm the victim. The Defendant then stabbed the unarmed victim 19 times, including several stab wounds to the victim's neck and chest. While at least two of the stab wounds would have been fatal within minutes, Dr. Lochmuller testified that the victim would likely have survived his wounds if he had received medical treatment. Dr. Lochmuller further testified that based upon the wounds inflicted to the victim's neck and chest, the victim would have been making "gurgling" noises. Rather than render aid, however, the Defendant set the bed on fire and fled the scene in the victim's car. He disposed of the murder weapon and drove to various family members' homes before turning himself in to police.

Based upon these facts, a rational juror could infer that the Defendant acted with premeditation when he killed the victim. Specifically, the Defendant procured a deadly weapon and used it on an unarmed victim; inflicted 19 stab wounds, including several to the victim's neck and chest - vital areas of the body; and failed to render aid to the victim, despite seeing him bleeding profusely. Additionally, he destroyed evidence by setting the bed on fire and then fled the scene and disposed of the murder weapon. This evidence was sufficient to show premeditation and intent.

The Defendant also argues that he was unable to premeditate the murder of the victim because he was voluntarily intoxicated when he killed the victim. In that regard, we note that

intoxication of a defendant does not justify the crime; however, its existence may negate a finding of specific intent. State v. Bullington, 532 S.W.2d 556, 560 (Tenn. 1976); T.C.A. § 39-11-503(a). "[I]f the voluntary [intoxication] of the accused exists to such an extent that he is incapable of forming a premeditated and deliberate design to kill, he cannot be guilty of murder in the first degree." Bullington, 532 S.W.2d at 560 (citing Mellendore v. State, 191 S.W.2d 149, 151 (1945), overruled on other grounds by State v. Buggs, 995 S.W.2d 102 (Tenn. 1999)). Moreover, even if the defendant's intoxication is not such to render him totally incapable of premeditation, the jury may still "consider his state of intoxication along with all other facts of the case to determine whether the killing was the result of a premeditated purpose[.]" Bullington, 532 S.W.2d at 560 (citations omitted).

In the present case, the jury heard evidence that the Defendant was under the influence of various drugs and alcohol at the time of the killing. The jury also heard conflicting testimony from two experts regarding the effects of those drugs and whether the Defendant had the capability to premeditate at the time of the killing. The trial court instructed the jury on intoxication, in part, as follows:

> Intoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of the defendant's culpable mental state.
>
> . . . If you find that the defendant was intoxicated to the extent that he could not have possessed the required culpable mental state, then he cannot be guilty of the offense charged.

The trial court properly instructed the jury on the issue, and by their verdict, the jury clearly found that the Defendant acted intentionally and with premeditation when he stabbed the victim and that his voluntary intoxication did not negate his specific intent to commit this crime. "The weight to be given the evidence and the determination of whether the voluntary intoxication negated the culpable mental elements were matters for the jury." State v. Morris, 24 S.W.3d 788, 796 (Tenn. 2000). We will not reweigh the evidence or substitute our inferences for those drawn by the trier of fact. See Dorantes, 331 S.W.3d at 379. Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

**B. Aggravated Arson.** The Defendant also challenges, in the "Issues Presented" section in his appellate brief, the sufficiency of the evidence supporting his conviction for aggravated arson. However, the Defendant failed to address this issue at all in the argument section of his brief. Consequently, this issue has been waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see also Tenn. R. App. P.

27(a)(7). Waiver notwithstanding, the evidence was more than sufficient to sustain the Defendant's conviction for aggravated arson.

For purposes of this case, a person commits aggravated arson when he "knowingly damages any structure by means of a fire . . . [w]ithout the consent of all persons who have a possessory, proprietary or security interest therein," and "[w]hen one (1) or more persons are present therein[.]" T.C.A. §§ 39-14-301(a)(1), -302(a)(1). There is no requirement that the person or persons present be injured or that the property actually be destroyed. State v. Lewis, 44 S.W.3d 501, 508 (Tenn. 2001). Further, arson is not a "result-of-conduct" offense. In other words, it does not "require that a defendant act with an awareness that setting a fire or creating an explosion is reasonably certain to cause damage to a structure." State v. Gene Shelton Rucker, No. E2002-02101-CCA-R3-CD, 2004 WL 2827004, at *10 (Tenn. Crim. App. Dec. 9, 2004), perm. app. denied (Tenn. Mar. 21, 2005). Rather, "the nature of the conduct - creating a fire or explosion - that causes the damage to the structure is consequential and central to the offense." Id. Thus, the knowing mens rea is satisfied where "the person is aware of the nature of the conduct" or the accompanying circumstances. T.C.A. § 39-11-302(b); see Gene Shelton Rucker, 2004 WL 2827004, at *10.

In the present case, the Defendant's own testimony established that he intentionally set fire to the bed in his motel room after stabbing the victim multiple times. Fire Marshall Ben Atchey corroborated the Defendant's admission and testified that there was no evidence that the fire was not intentionally set. He further testified that had the fire department not responded, the fire likely would have spread from the Defendant's single motel room to the entire building. Bill Patel, the owner of the Days Inn motel, testified that he did not give permission to the Defendant to set the fire and that there were multiple other guests staying at the motel on January 1, 2012. Additionally, although the Defendant claimed that he did not see any other guests at the Days Inn motel that evening, he was certainly aware of the victim's presence in the motel room when he set the fire. Dr. Lochmuller testified that the victim would have survived several minutes after the stabbing and was likely still alive when the Defendant set the fire. See State v. Vaughan, 144 S.W.3d 391, 415 (Tenn. Crim. App. 2003) (noting that "the jury was entitled to conclude that the victim was still alive while the [d]efendant went about the process of setting two fires, but died before being burned or inhaling any smoke"); State v. Richard Darrell Miller, No. 01C01-9703-CC-0087, 1998 WL 601241, at *6 (Tenn. Crim. App. Sept. 11, 1998), perm. app. denied (Tenn. Mar. 15, 1999) ("That [the victim] died while the defendants were in the act of starting the fire, rather than after the explosion, does not afford the defendant [] relief from this [aggravated arson] conviction."). Based on the evidence presented, a rationale juror could conclude, beyond a reasonable doubt, that the Defendant was guilty of aggravated arson.

**II. Self-Defense Jury Instruction.** The Defendant argues that the trial court erred in declining to instruct the jury on self defense. He maintains that his testimony regarding the sexual assault by the victim and the victim's assertion that he suffered from Acquired Immune Deficiency Syndrome (AIDS) after engaging in sexual conduct with the Defendant fairly raised the issue of self-defense, and therefore, the trial court should have so charged the jury. The State responds that the trial court properly declined to instruct the jury on self-defense because the facts do not provide a reasonable belief that the Defendant acted in self-defense. We agree with the State.

A defendant has a "'constitutional right to a correct and complete charge of the law.'" State v. Litton, 161 S.W.3d 447, 458 (Tenn. Crim. App. 2004) (quoting State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990), superseded by statute on other grounds as stated in State v. Reid, 91 S.W.3d 247, 291 (Tenn. 2002)). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." State v. Davenport, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (quoting State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986)). Because questions regarding the propriety of jury instructions are a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. State v. Smiley, 38 S.W.3d 521, 524 (Tenn. 2001).

As correctly noted by the Defendant, "[i]t is well settled that whether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." State v. Goode, 956 S.W.2d 521 (citing State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). However, a defendant is only entitled to a defense jury instruction where the issue is fairly raised by the evidence. T.C.A. § 39-11-203(c). The defendant has the burden of introducing this proof. Id., Sentencing Comm'n Cmts. To determine whether the defense has been fairly raised by the proof, the trial court must "consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence." State v. Bult, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998) (quoting State v. Shropshire, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993)).

Tennessee Code Annotated section 39-11-611(b)(1) provides, in pertinent part, that a person not engaged in unlawful activity and in a place he has a right to be is justified in using "force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force." "In addition, the use of deadly force in self-defense must be predicated on 'a reasonable belief that there is imminent danger of death or serious bodily injury.'" State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) (quoting T.C.A. § 39-11-611(b)(2)(A)); see also State v. Calvin Grissette, No. M2003-02061-CCA-R3-CD, 2004 WL 1950728, at *5 (Tenn. Crim. App. Sept. 2, 2004) ("The [defendant] must reasonably believe that the other's force creates an 'imminent danger of death or serious bodily injury.'" (quoting T.C.A. § 39-

-11-

11-611)). The danger must be "real, or honestly believed to be real," and the belief of danger must be "founded upon reasonable grounds." T.C.A. §§ 39-11-611(2)(B)-(C). In other words, the defendant must not only subjectively believe he is in imminent danger, but that belief must "meet an objective standard of reasonableness to be justified" under the defense. See Bult, 989 S.W.3d at 732. "[T]he mere fact that the defendant believes that his conduct is justified would not suffice to justify his conduct." Id.

In the present case, the trial court declined to instruct the jury on self-defense because it found that the evidence did not suggest that the Defendant reasonably believed he was in danger of imminent death or serious bodily injury. Upon our review of the record, we agree with the trial court's conclusion. The Defendant testified that he awoke to find the victim sexually assaulting him and that he easily pushed the victim off of him and ended the assault. A physical fight then broke out between the two men, but the Defendant confirmed that the victim was unarmed and smaller in size than the Defendant. Further, the Defendant testified that the fight had ended when he picked up the pocket knife and that he picked up the knife with the intent to hurt the victim. Dr. Newman testified that the Defendant told him that he wanted to hurt the victim "because the victim hurt [him]." This testimony does not suggest that the Defendant reasonably believed he was in danger of imminent death or serious bodily injury when he attacked the victim with the pocket knife.

The Defendant's contention that the victim told the Defendant that he suffered from AIDS does not alter our conclusion. We acknowledge that the knowing exposure of another to human immunodeficiency virus (HIV) is a class C felony. See T.C.A. § 39-13-109(a) (2011). However, the mere fact that the victim may have suffered from AIDS does not justify physical aggression out of fear of contracting the disease. See, e.g., State v. Lathan, 953 So.2d 890, 897 (La. Ct. App. 2007) (rejecting defendant's self-defense claim based on fact that victim suffered from HIV without evidence of an overt or hostile act by the victim toward the defendant); People v. Bucker, 579 N.E.2d 1166, 1169 (Ill. App. Ct. 1991) ("[The] defendant's belief that the [victim] was infected with the HIV virus in itself creates no necessity or legal justification for the use of deadly force absent criminal conduct which might transmit the virus[.]"). Here, there is no evidence that the Defendant believed he needed to use deadly force to prevent an assault by the victim that might transmit the disease. According to the Defendant, the victim informed him that he suffered from AIDS "after knowingly, willingly . . . letting [the Defendant] perform on him, and attempting to have anal intercourse with [the Defendant]." Thus, based on the Defendant's testimony, the knife attack was not to prevent possible exposure to AIDS as such exposure had already occurred. Further, the Defendant testified that the physical fight between him and the victim had ended when he picked up the knife and attacked the victim; accordingly, any threat of exposure to the disease through a physical fight with the victim had also ended. If anything, the Defendant's subsequent attack created a greater risk to be exposed to the disease. Like the

trial court, we conclude that the evidence did not fairly raise an issue as to whether the Defendant acted in self-defense. Thus, we find no error in the trial court's refusal to so charge the jury. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing authority and analysis, we affirm the judgment of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE